T.C. Summary Opinion 2016-72

UNITED STATES TAX COURT

OROBOSA OBAYAGBONA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14856-13S.                    Filed November 3, 2016.

Orobosa Obayagbona, pro se.

<u>Sara W. Dalton</u>, for respondent.

SUMMARY OPINION

CARLUZZO, <u>Special Trial Judge</u>:  This case was heard pursuant to the

provisions of section 7463 of the Internal Revenue Code in effect when the

petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not

---

[1]Unless otherwise indicated, section references are to the Internal Revenue
(continued...)

reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

In a notice of deficiency dated April 4, 2013 (notice), respondent determined the following deficiencies in, and accuracy-related penalties with respect to, petitioner's Federal income tax:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2008 | $9,040 | $1,808 |
| 2009 | 7,844 | 1,569 |

The issues for decision are whether petitioner: (1) for 2008, is entitled to various deductions claimed on Schedule C, Profit or Loss From Business, in excess of the amounts respondent allowed; (2) for both years in issue and pursuant to section 475(f), is entitled to ordinary loss treatment with respect to sales of stocks and securities; and (3) is liable for a section 6662(a) accuracy-related penalty for either year in issue.

---

[1](...continued)
Code of 1986, as amended, in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

## Background

Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner resided in Texas.

Petitioner graduated from the University of Houston in 1999 with a bachelor's degree in business administration. Soon thereafter he began working in the finance department of Halliburton Co. (Halliburton). Petitioner left Halliburton in 2003 and formed Robo Holdings, LLC (Robo), a Texas limited liability company through which he offered various business consulting services. At all times relevant, petitioner was the sole member of Robo, and Robo was treated as a sole proprietorship for Federal income tax purposes.

## I. Robo's Management Consulting Business

Petitioner worked for IBM Corp. (IBM) during part of 2007 and 2008. He left IBM in January 2008 to provide management consulting services through Robo (consulting business) to third-party clients as a subcontractor to Marketsphere Consulting (Marketsphere). In general, petitioner was responsible for managing whatever project Marketsphere assigned to him by ensuring that Marketsphere's clients were satisfied with respect to the progress being made on whatever project was then in place and that his team met all deadlines for their deliverables. Specifically, petitioner oversaw the day-to-day operations of his

assigned project, responded to client emails, and helped to resolve problems/issues that his team encountered. Much of petitioner's work was done onsite at the client's workplace although he did work remotely from time to time. Marketsphere paid petitioner $201,900 and $168,778 in 2008 and 2009, respectively; those amounts are each reported in income on the appropriate Schedule C for Robo.

During 2008 petitioner managed two projects for Marketsphere: one for Orbitz Worldwide (Orbitz) in Chicago, Illinois, from February to September 2008, and the other for First Data in Omaha, Nebraska, from August through December 2008. During 2008 petitioner routinely traveled from Houston to Chicago and Omaha in connection with these projects. Petitioner also traveled to Atlanta during 2008. Although First Data is headquartered in Atlanta, it is unclear whether any part of petitioner's travel to Atlanta was business related. At the time, he had two brothers living there, and his travels to Atlanta, including a trip over the Christmas holiday, seemed to be largely related to visiting with them.

Petitioner's father, Agbon Obayagbona, lived in Nigeria during the years in issue.

II. Securities Transactions

After leaving Halliburton in 2003, petitioner began trading securities on his own account through online accounts with TD Ameritrade and/or Fidelity. Most of his trades were completed from his house; some were effected through his smart cell phone. In addition to using some of the money he saved while employed at Halliburton to finance the trades, in 2003 and 2004 petitioner borrowed a total of $45,000 (collectively, loans) from Danny Lai, who worked with him at Halliburton.

The loans were evidenced by promissory notes and accrued interest at the rate of 21% per year. Petitioner did not make any loan repayments until 2008, and by the time he did, the loans were long overdue. According to petitioner's bank records, he made loan repayments to Mr. Lai in 2008 and 2009, as follows:

| Date | Amount |
|------|--------|
| February 2008 | $2,038 |
| March 2008 | 1,138 |
| July 2008 | 3,015 |
| July 2008 | 2,038 |
| September 2008 | 4,500 |
| October 2008 | 788 |
| January 2009 | 10,000 |
| Total | 23,517 |

There are no contemporaneous records showing whether the payments consist of principal, interest, or both. In preparation for trial petitioner prepared an amortization schedule with respect to the loans from Mr. Lai that indicates that $15,567.89 of interest had accrued on the loans as of the close of 2008. Petitioner also prepared a spreadsheet of interest payments. According to the schedule, during 2008 petitioner paid $16,648 in interest to various creditors, including $14,017 of interest paid to Mr. Lai.

The following table shows the extent of petitioner's trading activities during the years in issue:

| Month | Number of trading days in 2008 | Number of trading days in 2009 |
|---|---|---|
| January | 6 | 8 |
| February | 18 | 14 |
| March | 6 | 21 |
| April | 11 | 15 |
| May | 9 | 2 |
| June | 6 | 0 |
| July | 4 | 7 |
| August | 2 | 15 |
| September | 10 | 13 |
| October | 9 | 18 |
| November | 13 | 0 |
| December | 7 | 8 |
| Total | 101 | 121 |

Petitioner executed 253 and 252 total trades at an average trade size of $7,679 and $12,467 in 2008 and 2009, respectively. He held stocks for an average of 2.45 and 2.21 days in 2008 and 2009, respectively.

III. Procedural History

A. Return Preparation

Petitioner's 2008 and 2009 Federal income tax returns were prepared by a certified public accountant (C.P.A.). Income and deductions attributable to Robo are reported on a Schedule C included with each return that identifies Robo's principal business as "MANAGEMENT CONSULTIN [sic]",.

The 2008 Schedule C for Robo shows $201,900 of gross receipts[2] and the following deductions:

| Expense | Amount |
| --- | --- |
| Commissions and fees | $6,172 |
| Contract labor | 7,495 |
| Depreciation and section 179 | 7,379 |
| Insurance | 3,504 |
| Interest (other) | 16,648 |
| Office | 32,790 |
| Rent or lease of other business property | 5,760 |
| Supplies | 161 |
| Travel | 21,793 |

[2]All of the income reported on the Schedule C was nonemployee compensation from Marketsphere.

| Meals and entertainment | 12,043 |
| Utilities | 3,441 |

The 2008 and 2009 returns also included Forms 4797, Sales of Business Property, reporting ordinary losses of $29,097 and $50,791, respectively, related to petitioner's stock and securities trading activities and based on the mark-to-market method of accounting. Petitioner's 2004, 2005, 2006, 2007, 2008, and 2009 Federal income tax returns are in evidence. Securities transactions reported on petitioner's 2005, 2006, 2007, 2008, and 2009 returns suggest that petitioner made the mark-to-market election contemplated in section 475(f); securities transactions reported on petitioner's 2004 return are not consistent with the mark-to-market method of accounting. Petitioner's 2003 Federal income tax return is not available. Neither petitioner nor the CPA that prepared it retained a copy, and the original was destroyed consistent with respondent's record retention policy.

Petitioner submitted an amended 2008 return (amended return), received by respondent in February 2010. On the amended return, as relevant, petitioner claimed a $76,373 travel expense deduction on the Schedule C related to Robo, representing a $54,580 increase in travel expenses as compared to the travel expense deduction claimed on the Schedule C attached to his 2008 return. Marketsphere reimbursed petitioner for travel expenses of $54,580 and included

that amount in income on a Form 1099-MISC, Miscellaneous Income, issued to petitioner for 2008. Petitioner included the amount in income on his amended return and claimed a corresponding travel expense deduction on his Schedule C.

B. Respondent's Determinations

In the notice and as relevant, respondent: (1) disallowed all but $2,439 of the $32,790 office expense deduction for 2008; (2) allowed an additional $58,529 deduction for travel expenses taking into account amounts claimed on petitioner's 2008 original and amended returns; (3) recharacterized the losses claimed on the Forms 4797 for 2008 and 2009 from ordinary to capital; and, for both of those years, (4) imposed a section 6662(a) accuracy-related penalty on several grounds, including "negligence or disregard of rules or regulations" and a "substantial understatement of income tax". According to the notice, the deductions claimed on the Schedule C were disallowed because petitioner "did not establish that the business expense shown on * * * [his] tax return was paid or incurred during the taxable year and that the expense was ordinary and necessary to * * * [his] business." Also, according to the notice, the losses claimed on the Forms 4797 for 2008 and 2009 were disallowed because petitioner "did not prove that * * * [he] made [a] timely election for mark to market method of accounting or filed the necessary forms for change in accounting method, or shown that * * * [he]

otherwise * * * [qualifies] as a trader rather than and [sic] investor". Some of the adjustments made in the notice have been agreed to between the parties or conceded by one or the other of them, and other adjustments are computational. Those adjustments will not be discussed.

## Discussion

### I. 2008 Schedule C Deductions

As we have observed in countless opinions, deductions are a matter of legislative grace, and the taxpayer bears the burden of proof to establish entitlement to any claimed deduction.[3] Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). A taxpayer claiming a deduction on a Federal income tax return must demonstrate that the deduction is allowable pursuant to some statutory provision and must further substantiate that the expense to which the deduction relates has been paid or incurred. Sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976); Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965); sec. 1.6001-1(a), Income Tax Regs.

---

[3]Petitioner does not claim and the record does not demonstrate that the provisions of sec. 7491(a) are applicable, and we proceed as though they are not.

Taxpayers may deduct ordinary and necessary expenses paid in connection with operating a trade or business. Sec. 162(a); Boyd v. Commissioner, 122 T.C. 305, 313 (2004). To be ordinary the expense must be of a common or frequent occurrence in the type of business involved. Deputy v. du Pont, 308 U.S. 488, 495 (1940). To be necessary an expense must be appropriate and helpful to the taxpayer's business. Welch v. Helvering, 290 U.S. 111, 113 (1933). The expenditure must be "directly connected with or pertaining to the taxpayer's trade or business". Sec. 1.162-1(a), Income Tax Regs. On the other hand, section 262(a) generally disallows a deduction for personal, living, or family expenses.

With these fundamental principles of Federal income taxation in mind, we consider petitioner's claims to the various deductions in dispute for 2008.

A. Office Expenses

Petitioner claimed a $32,790 deduction for office expenses[4] on the Schedule C for Robo. According to petitioner, the following expenses are included in that deduction:

---

[4]Petitioner concedes that certain expenses related to his Schedule C business were miscategorized generally as "office expenses". We ignore petitioner's characterization and consider whether each expense is otherwise deductible.

| Expense | Amount |
| --- | --- |
| Janitorial fees | $600 |
| Tax preparation fees | 875 |
| Miscellaneous expense 1 | 200 |
| Payment of loan interest | 14,500 |
| Wire transfer fee | 76 |
| Nigerian office rent | 6,604 |
| Miscellaneous expense 2 | 136 |
| Vendor payments | 5,352 |
| Miscellaneous expense 3 | 184 |
| Airport parking | 1,440 |
| International calling card | 480 |
| Laptop bag | 260 |
| Miscellaneous expense 4 | 204 |
| Miscellaneous expense 5 | 224 |
| Miscellaneous expense 6 | 16 |
| Software | 195 |
| Miscellaneous expense 7 | 451 |
| Miscellaneous expense 8 | 5 |
| Miscellaneous expense 9 | 191 |
| Referral fees | 797 |

In the notice, respondent allowed as a deduction the amounts for tax preparation fees, the laptop bag, and software and allowed partial deductions for airport parking, the international calling card, miscellaneous expense 4, and miscellaneous expense 7.  The amounts not allowed remain in dispute.

1.  Deduction for  "Payment of Loan Interest"

The office expense deduction includes a $14,500 deduction for interest paid to Mr. Lai with respect to the loans.  According to respondent, petitioner has not

established that any amount he paid to Mr. Lai constitutes interest rather than principal. Furthermore, respondent points out that even if amounts paid to Mr. Lai during 2008 include interest, petitioner has already been allowed a $14,017 deduction for interest paid to Mr. Lai as that amount is included in the $16,648 "Interest (Other)" deduction claimed on the Schedule C.

In general, there is "allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Sec. 163(a). Because petitioner is a cash basis taxpayer, interest allocable to his business debts is deductible when paid. See id.

Petitioner's bank records show that petitioner made payments totaling $13,517[5] to Mr. Lai in 2008. In effect, petitioner has already been allowed a $14,017 deduction with respect to interest he claims to have paid to Mr. Lai. He is not entitled to a deduction, regardless of how it is shown on his return, in excess of that amount.

---

[5]A $10,000 payment to Mr. Lai was debited to petitioner's bank account and transferred to Mr. Lai's bank account in January 2009. Because the payment was made in 2009, and to the extent that any or all of that payment constituted interest on the loans, petitioner would not be entitled to an interest deduction for that amount for 2008.

2.  Nigerian Office Rent

The office expense deduction includes $6,604 that petitioner claims to have paid to rent office space in Nigeria. According to petitioner, in 2004 he attempted "to get a consortium of investors to participate in a privatization of assets of the Nigerian government" (Nigeria project). According to petitioner, Nigerian law required a business to have a "representative office" in Nigeria in order to conduct business with the Nigerian Government. Petitioner claims he began renting office space in a building owned by his father, Agbon Obayagbona, in 2004, and that he continued to do so in 2008. According to respondent, petitioner has not shown that the rent expense was "ordinary and necessary" in connection with Robo's trade or business. We agree with respondent.

The Nigerian project is hardly related to the business consulting activity petitioner conducted through Robo. Even if we consider the Nigerian project as a separate activity, there is insufficient evidence in the record to establish that whatever petitioner was doing during 2008 in connection with it constituted a trade or business within the meaning of section 162. A taxpayer has not "'engaged in carrying on any trade or business' within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized." Richmond Television Corp. v. United

States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other grounds, 382 U.S. 68 (1965). There is no showing that the Nigerian project functioned as a "going concern" as of the close of 2008. At best, according to petitioner's description of the activity, any expenses paid or incurred in connection with it would have to be capitalized and could be deducted only as allowable startup expenditures pursuant to section 195. See also Hardy v. Commissioner, 93 T.C. 684 (1989), aff'd in part, remanded in part per order, 1990 U.S. App. Lexis 19670 (10th Cir. Oct. 29, 1990). Nothing in the record suggests that petitioner made the election contemplated in section 195(b); consequently he is not entitled to a deduction for any expenses, rent or otherwise, that he might have paid or incurred in connection with the Nigerian project.

### 3. Vendor Payments

The office expense deduction includes $5,351.98 for vendor payments related to services petitioner's brother provided to petitioner's consulting business. According to respondent, petitioner has not shown that the vendor payments were "ordinary and necessary" to Robo; that being so, according to respondent, the expense is not deductible.

Compensation is deductible as a trade or business expense only if it is: (1) reasonable in amount, (2) based on services actually rendered, and (3) paid or

incurred. See O'Connor v. Commissioner, T.C. Memo. 1986-444; sec. 1.162-7(a), Income Tax Regs. Transactions between family members are subject to close scrutiny. See Denman v. Commissioner, 48 T.C. 439, 450 (1967); Hamdi v. Commissioner, T.C. Memo. 1993-38, aff'd without published opinion, 23 F.3d 407 (6th Cir. 1994). This is so, at least in part, because section 262(a) generally disallows deductions for personal, living, or family expenses.

According to petitioner, his brother provided "documentation for projects" to petitioner's consulting business at a rate of $45 per hour for a total of 105 hours during 2008. Petitioner did not maintain any sort of business records with respect to his brother's hours, duties, and/or earnings. Although petitioner claims to have issued his brother a Form 1099-MISC for 2008 reporting income of $5,351.98, the income reported on his brother's 2008 joint Federal income tax return does not include that amount. The inconsistent treatment of the amount petitioner claims to have paid his brother greatly undermines petitioner's claim that it was compensation. See Haeder v. Commissioner, T.C. Memo. 2001-7; Martens v. Commissioner, T.C. Memo. 1990-42, aff'd without published opinion, 934 F.2d 319 (4th Cir. 1991); O'Connor v. Commissioner, T.C. Memo. 1986-444. Consequently, petitioner is not entitled to a $5,351.98 deduction for vendor payments, and respondent's disallowance of that deduction is sustained.

### 4. Office Expenses Remaining in Dispute

Petitioners offered no explanation for the deduction for office expenses that remain in dispute. A taxpayer is hardly entitled to a deduction for an unexplained expense. Accordingly, petitioner is not entitled to a deduction for the office expenses remaining in dispute in excess of the amounts respondent already allowed.

### B. Travel Expenses

On the Schedule C attached to his 2008 return petitioner reported a $21,793 travel expense deduction. Petitioner now claims, as reported on the amended return, a $76,373 deduction for travel expenses. In the notice, respondent allowed a $58,529 deduction for travel expenses based on an allowance of the entire amount claimed as an additional travel expense deduction on the amended return and a partial allowance of the amount claimed for travel expenses on petitioner's 2008 return. According to petitioner, the $17,844 that remains in dispute includes unreimbursed expenses for air fare, buses/taxis, car rentals, gasoline, meals, and hotels incurred on behalf of Robo.

Petitioner's records generally substantiate that the travel expenses that remain in dispute have been paid. See sec. 6001; Hradesky v. Commissioner, 65 T.C. at 90; sec. 1.6001-1(a), Income Tax Regs. Nonetheless, he has failed to

establish that he is entitled to a travel expense deduction over and above what respondent has already allowed. First, with respect to the expenses for travel to Omaha and Chicago relating to his arrangement with Marketsphere, petitioner has failed to establish that the deductions he claims were not already allowed in the notice. See Avery v. Commissioner, T.C. Memo. 1993-344 (no deduction for real estate taxes paid when taxpayers failed to prove the expenses were not already allowed as deductions). Second, with respect to the expenses of traveling to locations other than Omaha and Chicago, neither petitioner's records nor his testimony adequately substantiates the business purpose of those trips. See sec. 274(d). Third, with respect to the expenses of traveling to locations other than Omaha and Chicago, petitioner has failed to establish that those expenses were ordinary and necessary business expenses of Robo. See sec. 162(a). Other than his generalized statement that expenses of traveling to locations other than Omaha and Chicago related to "business trip [sic] to develop potential business or discuss business opportunities", petitioner did not present any evidence corroborating his statement. Accordingly, we hold that petitioner is not entitled to a deduction for travel expenses in excess of the amount respondent has already allowed.

## II. Trader or Investor and Mark-to-Market Election

Petitioner claims that a section 475(f) election was made with his 2003 Federal income tax return. That being so, according to petitioner, he is entitled to use the mark-to-market method of accounting with respect to gains or losses realized in sales of stocks and securities. Respondent argues that the 2007 and 2008 trading losses are not entitled to the mark-to-market treatment because: (1) petitioner failed to establish that a valid election has been made and (2) petitioner does not qualify as a "trader" within the meaning of section 475(f).

In general, section 475(f)(1) provides that a taxpayer engaged in a trade or business as a trader in securities may elect to apply the mark-to-market method of accounting to securities held in connection with that trade or business. The mark-to-market method allows a trader in securities to recognize gain or loss on any security held in connection with the trade or business at the close of the taxable year as if the security were sold for its fair market value at the end of the year. Sec. 475(f)(1)(A)(i); Knish v. Commissioner, T.C. Memo. 2006-268; Chen v. Commissioner, T.C. Memo. 2004-132.

If a taxpayer is entitled to make, and timely makes, an election under section 475(f), then any net loss from the business of trading in securities will be treated as an ordinary loss deductible under section 165(c)(1). See sec. 475(f)(1)(D),

(d)(3).  If the election is not made, any net loss is deductible only to the extent of any capital gains plus $3,000.  See secs. 165(a), (c), (f), 1211(b)(1).

Rev. Proc. 99-17, 1999-1 C.B. 503, specifies the procedure for making an election under section 475(f).  Once the election is made, use of the mark-to-market method continues for all subsequent taxable years unless the election is revoked with the consent of the Commissioner.  Rev. Proc. 99-17, sec. 4, 1999-1 C.B. at 504.  A securities trader electing under section 475(f) to use the mark-to-market method of accounting for securities held in the business is required to file with the Commissioner a statement making the mark-to-market election, identifying the first taxable year for which the election is effective, and describing the business to which the election relates.  See Kantor v. Commissioner, T.C. Memo. 2008-297; Knish v. Commissioner, T.C. Memo. 2006-268; Lehrer v. Commissioner, T.C. Memo. 2005-167, aff'd, 279 F. App'x 549 (9th Cir. 2008); Rev. Proc. 99-17, sec. 5 .03(1), 1999-1 C.B. at 504.  The statement must be filed no later than the due date of the trader's original Federal income tax return (without regard to extension) for the taxable year immediately preceding the election year; and if the election entails a change in accounting method, the trader must also attach a Form 3115, Application for Change in Accounting Method, to the trader's timely filed original Federal income tax return for the election year.

Rev. Proc. 99-17, sec. 5.03(1), 5.04, 1999-1 C.B. 504, 505.  A trader who fails to adhere to the election requirements of the revenue procedure is not entitled to use the mark-to-market method of accounting.  See Kohli v. Commissioner, T.C. Memo. 2009-287; Kantor v. Commissioner, T.C. Memo. 2008-297; Knish v. Commissioner, T.C. Memo. 2006-268.

According to petitioner, the relevant election was properly made and included with his 2003 return.  As noted, that return is not available.  Petitioner's claim that the election was made with his 2003 return, however, is inconsistent with the way the securities transactions are reported on his 2004 return.  Furthermore, there is nothing on petitioner's 2004, 2005, 2006, or 2007 return that indicates that the section 481 adjustment sometimes required in connection with a section 475(f) election has been made.  Lastly, although petitioner engaged in numerous trades during each year in issue, we have found in other cases that similar levels of trades were insufficient to qualify the taxpayer as a "trader" for purposes of section 475(f).  See Endicott v. Commissioner, T.C. Memo. 2013-199 (204 executed trades and 303 executed trades was not substantial, but 1,543 executed trades was substantial); see also Kay v. Commissioner, T.C. Memo. 2011-159 (313 executed trades was not substantial); Holsinger v. Commissioner, T.C. Memo. 2008-191 (372 executed trades was not substantial).  Accordingly, if

only for one of those reasons, petitioner is not entitled to use the mark-to-market method of accounting for either year in issue, and respondent's adjustment recharacterizing the trading losses shown on petitioner's 2008 and 2009 returns from ordinary to capital is sustained.

III.  Section 6662(a) Accuracy-Related Penalty

Lastly, we consider whether petitioner is liable for a section 6662(a) accuracy-related penalty for either year in issue.  Relying upon various grounds, including a substantial understatement of income tax, respondent argues that he is. See sec. 6662(a)-(d).

Section 6662(a) imposes a penalty of 20% of the portion of an underpayment of tax attributable to, among other things, a substantial understatement of income tax.  Sec. 6662(b)(2).  An understatement of income tax is substantial within the meaning of section 6662 if, as relevant here, the understatement exceeds $5,000. See sec. 6662(d); sec. 1.6662-4(b), Income Tax Regs.

Respondent bears the burden of production with respect to the imposition of the penalties imposed in the notice and here in dispute, see sec. 7491(c), and that burden has been satisfied because the understatement of income tax for each year in issue (here computed in the same manner as the deficiency) will exceed $5,000,

see secs. 6211, 6662(d)(2), 6664(a). That being so, it is petitioner's burden to establish that the imposition of the penalty is not appropriate. See Higbee v. Commissioner, 116 T.C. 438, 447 (2001); see also Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

The accuracy-related penalty does not apply with respect to any portion of an underpayment for which it is shown that the taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1). For purposes of section 6664(c) a taxpayer may be able to establish reasonable cause and good faith by showing reliance on professional advice. Sec. 1.6664-4(b)(1), Income Tax Regs. To establish good faith and reasonable cause through reliance on professional advice, the taxpayer must show that: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioner's 2008 and 2009 returns were prepared by his CPA. The fact that petitioner had a CPA prepare his returns does not, in and of itself, establish that he acted with reasonable cause and in good faith. See id. at 99-100. Petitioner offered no evidence establishing that he gave his CPA all necessary and accurate

information with respect to the Schedule C deductions at issue; instead, petitioner acknowledged that his CPA relied on unsubstantiated schedules of expenses prepared by petitioner. We find that petitioner has failed to establish that he acted with reasonable cause and in good faith with respect to the underpayment of income tax arising from the disallowance of the Schedule C deductions.

However, we find that petitioner acted in good faith and had reasonable cause for the underpayment of tax required to be shown on his 2008 and 2009 returns with respect to the disallowance of the ordinary losses reported on the Forms 4797. Although we have found that petitioner failed to prove that the relevant election was made, or that he qualified to make the election, we further find that he honestly believed that it was and he did. After all, by the time his 2008 and 2009 returns were filed, petitioner had applied the mark-to-market method of accounting to the securities transaction shown on his 2005, 2006 and 2007 returns, and that treatment apparently went unchallenged by respondent. Accordingly, petitioner is liable for a section 6662(a) penalty, but only with respect to the underpayment of tax attributable to the disallowance of the Schedule C deductions.

To reflect the foregoing,

Decision will be entered

under Rule 155.